# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

GERALD PETERS,

        Plaintiff,

                                      No. 1:21-cv-00564-WJ-JMR

    v.

JOSEPH FRONTIERE, NICHOLAS
FRONTIERE, MICHAEL GHISELLI,
JOSEPH CELLURA, and TARSIN
MOBILE, INC.,

        Defendants.

JOSEPH FRONTIERE and NICHOLAS FRONTIERE,

        Cross-Claimants,

v.

MICHAEL GHISELLI, JOSEPH CELLURA,
and TARSIN MOBILE, INC.,

        Crossclaim Defendants.

## <u>MEMORANDUM OPINION AND ORDER DENYING JOSEPH FRONTIERE'S AND NICHOLAS FRONTIERE'S MOTIONS FOR SUMMARY JUDGMENT</u>

        **THIS MATTER** is before the Court on Defendants Nicholas Frontiere's and Joseph Frontiere's ("the Frontieres'") Motions for Summary Judgment. The Frontieres request the Court dismiss all Plaintiff Gerald Peters' claims against them. Having considered the parties' briefing and the applicable law, the Court concludes the Frontieres are not entitled to summary judgment on any of Peters' claims. The Motions for Summary Judgment (**Docs. 186, 187**) are therefore **DENIED**.

1

## BACKGROUND[1]

Gerald Peters ("Peters") is a well-known gallery owner and businessman in Santa Fe, New Mexico. It is undisputed that Peters invested $750,000 in Tarsin Mobil, Inc. ("Tarsin"[2]) in July of 2019. Peters first learned of this investment opportunity from Joseph and Nicholas Frontiere, the sons of one of Peters' close friends. **Doc. 200-19 at 113:18–114:08.** Peters has known Joseph and Nicholas since they were children. **Doc. 200-3 at 13:25–14:4; 14:10–16.** Peters' wife testified that she took Joseph and Nicholas camping throughout their childhood. **Doc. 200-18 at 8:7–22.** The Frontieres' mother also testified that Peters' wife often took the Frontiere boys fishing when they were children, that Peters' wife took Nicholas to Europe, and that Nicholas considered himself a part of the Peters family. **Doc. 200-5 at 13:08–22**. As the Frontiere brothers grew up, they moved away from Santa Fe, but Peters still saw them once or twice a year when they were in town. The relationship between the Frontieres and Peters remained strong. For example, the Frontieres felt comfortable using the Peters Gallery conference room while Peters was away on vacation, **doc. 206-13**, staying at Peters' house in New York, **doc. 184-23**, asking Peters to meet with them on short notice, **doc. 206-14**, and calling and texting Peters with emergencies in the middle of the night, **doc. 206-15**.

In June 2019 the Frontieres became involved with Tarsin Mobile Inc. Tarsin was a technology, hospitality, and entertainment company. Before joining Tarsin's management team, the Frontieres took several meetings with top Tarsin executives. On June 14, Joseph Cellura—

---

[1] For purposes of the Motions, the background facts are either uncontroverted, or, where genuinely controverted, are viewed in the light most favorable to Peters, the party opposing the grant of summary judgment. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 964 (10th Cir. 2022).

[2] The parties refer to Tarsin Mobile, Inc. as both "Tarsin" and "TMIX." For simplicity and to avoid confusion, the Court refers to Tarsin Mobile, Inc. as "Tarsin."

Tarsin's CEO—emailed Joseph Frontiere financial information about Tarsin and Lord Cultural. **Docs. 189-1, 189-2**. Lord Cultural was a company in the field of art and museums that Tarsin was considering acquiring and taking through an initial public offering. **Docs. 200-2 at 1, 200-19 at 70:12–17, 188-1 at 230:14–232:10.** Joseph Frontiere also met with Mr. Cellura and Lee Hanson, another Tarsin executive, in Santa Fe, New Mexico in mid-June 2019. **Doc. 184-2**. Nicholas Frontiere participated in the meeting remotely. **Doc. 184-3 at 34:03–13**. On July 1, 2019, Mr. Cellura emailed Joseph and Nicholas Frontiere a brief history of Tarsin, including an explanation that Tarsin was not a publicly reporting company. **Docs. 189-3, 184-1 at 3.** Also on July 1, 2019, Lee Hanson emailed Joseph and Nicholas Frontiere a disclosure statement for Tarsin, explaining that Tarsin had gone through bankruptcy proceedings between November 29, 2017, and January 2019. **Doc. 184-1 at 4**. By July 9, 2019, the Frontieres had arranged an ownership stake in Tarsin, and Mr. Cellura emailed the Frontieres a table confirming that Nicholas had a ten percent (10%) interest, and Joseph had a five percent (5%) interest in Tarsin. **Doc. 189-7**. The table also identified "Joey Frontiere" and "Nicky Frontiere" as Tarsin executives. *Id.*[3]

On July 15, 2019, the Frontieres approached Peters with the opportunity to invest in Tarsin. **Docs. 200-2, 184-6**. Joseph Frontiere and Peters met for lunch in Santa Fe. During this lunch, the discussion focused on Tarsin's merger with Lord Cultural. **Doc. 200-2 at 3.** Joseph Frontiere held Lord Cultural out to Peters as "an established, highly profitable, operating company in the field of art and museums that made around $10 million a year." **Doc. 200-2 at 3**. Joseph also claimed "his brother Nicholas's software was being combined with the existing operations of Lord Cultural." *Id.* And Joseph Frontiere told Peters that Peters "had to move quickly because they had to complete

---

[3] Nicholas Frontiere and Joseph Frontiere are referred to in various documents as "Nicky" and "Joey."

their deal with Lord Cultural immediately." *Id.* Joseph Frontiere explained that Tarsin was well on its way to raising the $10 million needed to complete the deal with Lord Cultural, and that Peters "had to hurry before the opportunity sold out." *Id.* **3-4.**

After the lunch, Peters reached out to Nicholas Frontiere to verify what Joseph had told him. *Id.* **at 4.** Nicholas confirmed everything Joseph had said at lunch and reassured Peters that "it was a safe deal and that Tarsin was a solid, existing company with a great business model that they were going to grow." *Id.* Nicholas also told Peters that he had invested $40,000 of his own money in Tarsin and that he had conducted extensive due diligence and that "everything checked out." *Id.* Nicholas went on to explain that he was creating the software that would increase the value of the company after the initial public offering from $1.00 per share to $17.50 per share. *Id.* Peters thought the 17.5 times return on investment "sounded ambitious," but Joseph and Nicholas offered him the reassurance that he would be guaranteed his money back with five percent (5%) interest after one year. *Id.* Joseph and Nicholas also told Peters that "there were details about the company they couldn't talk about yet but that once [Peters] invested, [he] would receive more information." *Id. See also* **Doc. 200-8**.

Nicholas' reassurances held particular weight in Peters' mind because of Nicholas' academic and professional successes. At age sixteen, Nicholas began working at Los Alamos National Laboratories. **Docs. 184-22 at 28**, **200-3 at 99:2–8** (Nicholas, "at 16, rewrote the software for a classified satellite we have that tracks weapons grade plutonium . . . . He traded in the stock market, paid for his college. His dad was very proud of that he didn't have to pay for [Nicholas'] college."). Nicholas then graduated summa cum laude from UCLA with degrees in physics and mathematics and went on to earn a Ph.D. in computational physics from the University of Chicago. **Doc. 184-22 at 28**. In 2019, Nicholas had been a multi-year finalist for the Gordon Bell

supercomputing prize and was conducting research for Argonne National Laboratory. *Id.* Peters contends that he trusted Nicholas and relied on his expertise "because Nicholas has an extensive background in technology as well as top-secret clearance working at a national lab." **Doc. 200-2 at 12.** Additionally, Peters "explicitly asked Nicholas whether doing these sorts of deals would put his security clearance at risk," and Nicholas reassured Peters that Tarsin was "established, the deal was clean, and that he would never put his career in jeopardy by getting involved in anything risky." **Doc. 200-2 at 13.** According to Peters, "Nicholas had far more to lose than [Peters] did because of his security clearance and so [Peters] relied on the due diligence he told [him] he had performed prior to making his own investment in Tarsin." *Id.*

On July 19, 2019, the Frontieres sent Peters a Promissory Note ("The Note"), which Peters executed and returned the same day. **Docs. 184-14, 184-15, 184-17, 184-18.** In the Note, Peters agreed to invest $750,000 in Tarsin with repayment of the $750,000 plus five percent interest due in twelve months. **Doc. 184-18.** Peters executed the Note on July 19, 2019, but he did not wire transfer the money until July 26, 2019. *See* **doc. 184-25.** According to Peters, after signing the promissory note, he "hesitated to approve the wire transfer because [he] felt uncertain about the investment." **Doc. 200-2.**

On July 22, 2019, Joseph Frontiere sent an email urging Peters to wire the money to Tarsin. **Doc. 200-9 at 4.** Over the next couple of days, the Frontieres sent two investor "pitch decks"[4] to Peters about Tarsin and Lord Cultural. **Docs. 200-2, 200-6, 184-22.** First, on July 23, 2019, Joseph emailed Peters an older pitch deck. **Doc. 200-2.** Then on July 24, 2019, the Frontieres sent Peters an updated Tarsin pitch deck. **Doc. 184-22.** This pitch deck listed Joseph and Nicholas Frontiere

---

[4] The pitch decks appear to be promotional PowerPoint slideshows that use both pictures and words to explain a particular company to prospective investors.

as members of the Tarsin management team—Joseph as "Corporate Finance Director" and Nicholas as "Technology Advisor." **Doc. 184-22 at 24.** The pitch deck referenced many other companies. Based on this pitch deck, Peters felt "comfortable wiring $750,000 because it was clear that there was far more substance behind [Tarsin] than just Lord Cultural. The [pitch deck] showed that Tarsin had a long history of accomplishments and completed projects including real estate development with highly successful business partners such as Universal Music Group and Killian Construction and a very qualified management team." **Doc. 200-2 at 5.** Within an hour of emailing the pitch deck to Peters, Joseph texted Peters saying, "I sent a deck with a summary of Tarsin holdings. Tarsin owns them all and is having an [initial public offering] which you got in on early." **Doc. 184-23.** But according to Mr. Ghiselli's—Tarsin's COO's—later testimony, Tarsin had no agreements with any of the companies listed in the pitch deck at that time. **Doc. 200-13 at 153:2– 10; 173:3–174:5**.

The same day the Frontieres sent the second pitch deck to Peters, Tarsin executive Lee Hanson emailed the Frontieres updated financial for Lord Cultural. **Docs. 189-8, 189-9.** Lord Cultural's Profit and Loss statements showed Lord Cultural made nowhere near the $10 million a year that the Frontieres had claimed: In fact, Lord Cultural operated at a loss of $1.6 million in 2017, made less than $200,000 in 2018, and was not projected to make more than six figures for the foreseeable future. **Doc. 189-9**. The Frontieres did not forward this information to Peters or inform him of it. On July 25, 2019, Joseph again texted Peters to urge him to wire the money for the investment "for mine and Nick's meeting in New York." **Doc. 200-2.** Peters finally wired the $750,000 to Tarsin on July 26, 2019. **Doc. 184-25**.

At the time Peters invested, Tarsin appears to have had no revenue and no assets of any kind. **Doc. 200-12 at 23:18–25** (Deposition of Joseph Cellura) ("Q. . . . What would you estimate

was Tarsin's value in July of 2019? A. It would be arbitrary. Q. What does that mean? A. It would not be based on revenues because there were none. It would not be based on income because there was none."); *id.* at 26:11–14 ("Q. But other than some written agreements, there weren't any tangible assets to back up a valuation? A. No, it was development stage."); **Doc. 200-13 at 290:17– 19** (Deposition of Michael Ghiselli) ("Q. Okay. What – how much money has Tarsin Mobile made since you've been there? A. Oh, nothing."). Peters's expert and certified public accountant, Mr. Seigneur, testified that he could not find any evidence that Tarsin was close to an initial public offering. **Doc. 200-10 at 12, 35–38;** *see also* **doc. 200-11 (186:13–187:10)**. Although Peters was led to believe that $1.00 per share was a low price for Tarsin stock, Joseph Cellura explicitly communicated to Joseph Frontiere that the stock was valued at $0.51 per share. **Doc. 200-2 at 5.** Even the Frontieres' claim that Nicholas Frontiere's software would be combined with existing operations of Lord Cultural never panned out.

On July 26, 2019—the same day Peters wire transferred the $750,000 to Tarsin—Tarsin wire transferred $80,000 into Joseph Frontiere's personal bank account. **Doc. 184-26 at 11.** On September 24, 2019, Tarsin entered a service contract with Joseph and Nicholas Frontiere ("Application Development Agreement") through Frontiere Technologies, Inc., which called for $340,000 for the development of a Tarsin Dashboard. **Doc. 184-28 at 2-3.** Tarsin paid $210,000 to Frontiere Technologies, **doc. 184-26 at 26, 68,** and Tarsin made out a cashier's check for $103,000 to Joseph Frontiere, **doc. 184-28 at 7**, but no work was ever performed under this agreement, **docs. 184-19 at 69:4–8, 184–13 at 170:11–20**.

On September 22, 2019, Peters received an email from Mr. Ghiselli—Tarsin's COO— claiming Tarsin needed Peters to fill out a W-9 form for their "transfer agent." **Doc. 200-2 at 17**. This seemed like a strange request to Peters, and he thought it might be a phishing attempt, so he

forwarded the email to his executive assistant. *Id.* His assistant reached out to Tarsin to confirm that it was a legitimate request but received no response. *Id.* By September 30, 2019, the controller for Peters Corp began inquiring internally about whether Peters had received any stock certificates to correspond with the $750,000 wire transfer. *Id.* Because Peters stopped receiving any information about Tarsin, including from Joseph and Nicholas Frontiere, Peters contacted his general counsel. *Id.*

On November 26, 2019, Peters sent a letter demanding Tarsin return his investment. **Doc. 188-11.** In response, Mr. Cellura sent Peters an email stating that Tarsin's investment bankers and attorneys had advised him that "Joey Frontiere claims [Peters's $750,000 investment], as well as the investment funds received by Tarsin Mobile, Inc. . . . from other Santa Fe individuals, represents his [meaning Joseph's] personal investment made with money from his family's trust." **Docs. 200-16 at 2**, **200-15.** And on February 24, 2020, Joseph Cellura and Michael Ghiselli told Peters's general counsel that Tarsin intended to pursue claims against Joseph Frontiere. **Doc. 200-17** ("Tarsin intends on pursuing the full prosecution of these claims and will seek imposition of a constructive trust."). In February 2020, Peters reached out multiple times to Joseph Frontiere to ask him to explain what happened to the investment and to try to get his money back. **Doc. 200-2.** Joseph Frontiere never responded. *Id.*

In 2021, Peters filed suit against the Frontieres and the Tarsin Defendants,[5] seeking to recoup his money on the basis that Defendants fraudulently induced him to invest in their company. To this end, Peters brings claims against the Frontieres for Federal Securities Fraud (Count I), New Mexico Securities Fraud (Count II), Common Law Fraud (Count III), Negligent Misrepresentation

---

[5] The Tarsin Defendants include Michael Ghiselli, Joseph Cellura, and Tarsin Mobile, Inc. The Tarsin Defendants filed their own motion for summary judgment raising many of the same arguments raised here. The Court addresses that motion in a separate opinion and order.

(Count IV), Civil Conspiracy (Count VII), and Promissory Estoppel (Count X). **Doc. 9**. Peters seeks an accounting (Count VIII) and the imposition of a constructive trust (Count IX), among other remedies.

The Frontieres each filed a motion for summary judgment. **Docs. 186, 187**. Because both motions raise similar arguments and rely on essentially the same law and facts, Peters filed a combined Response and the Frontieres filed a combined Reply. **Docs. 206, 210**. In line with the parties' treatment, the Court resolves the motions in a single memorandum opinion and order.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1261 (10th Cir. 2022) (citation omitted). "The summary judgment standard requires [the Court] to construe the facts in the light most favorable to the nonmovant and to draw all reasonable inferences in its favor." *Id.*

"The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, but once the moving party has done so, the burden shifts to the non-movant to establish a genuine issue of fact." *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1197 (10th Cir. 2022). A defendant—or party *not* bearing the burden of persuasion at trial—may also move for summary judgment "by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim." *Libertarian Party of NM v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that

9

there is an absence of evidence to support the nonmoving party's case."). When faced with this type of challenge, the nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case." *SEC v. Thompson*, 732 F.3d 1151, 1157 (10th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322).

To make this showing, the nonmoving party must set forth specific facts on which a jury could reasonably find for the plaintiff. *Farnsworth v. Town of Pinedale, Wyo.*, 968 F.2d 1054, 1056 (10th Cir. 1992). These specific facts must be identified by reference to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, and other materials." Fed. R. Civ. P. 56(c)(1)(A). But the nonmoving party need not definitively prove each element; rather, the nonmovant need only establish "an inference of the presence of each element essential to the case." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001). That said, "a complete failure of proof concerning an essential element of the nonmoving party's case" will entitle the movant to judgment as a matter of law. *Celotex*, 477 U.S. at 322-23.

### DISCUSSION

**Counts I & II:          Federal and State Securities Fraud Claims**

The Frontieres urge summary judgment on Peters's state and federal securities fraud claims. To prove private federal securities fraud, Peters must establish "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). To prove private securities fraud under the New Mexico Uniform Securities Act, Peters must show the Frontieres sold a security "by means of an

untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made . . . not misleading" and that Peters did not "know[] the untruth or omission." NMSA 1978, § 58-13C-509(B) (2010).

*First*, the Frontieres argue the securities claims fail because Peters never purchased a security; however, the Frontieres provide no legal authority to support this conclusion. Whether an instrument qualifies as a security is a question of law. *SEC v. Thompson*, 732 F.3d 1151, 1160 (10th Cir. 2013). "Security" is defined by federal law as "***any note***, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement . . . ." 15 U.S.C. § 78c (2012) (emphasis added). Notes are presumed to be securities. *Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990). But this presumption can be rebutted. *Id.* at 67. The Frontieres could have attempted to rebut this presumption by showing the Note Peters signed on July 19, 2019, bears a strong resemblance to one of the following instruments:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized).

*Id.* at 65. But the Frontieres failed to do so in their initial motions and did not address the issue at all in their Reply. Thus, the presumption goes unrebutted, and the Frontieres are not entitled to summary judgment.

In Response, Peters urges the Court to enter summary judgment in his favor on the same issue. **Doc. 206 at 47** (incorporating by reference arguments make in **Doc. 200 at 53**). Peters contends the Court can enter summary judgment because the Frontieres—having raised the issue in the first place—had ample opportunity to brief whether the Note was a security and failed to do

so. But what Peters fails to account for is that the Tarsin Defendants, having not raised the issue in their summary judgment motion, did not have the opportunity to brief the issue and were not on "notice that [they] had to come forward with all of [their] evidence" on this issue. *Celotex*, 477 U.S. at 326. Because the Tarsin Defendants would also be impacted by a ruling that the Note is a security, it would be improper for the Court to enter summary judgment in favor of Peters without providing the Tarsin Defendants an opportunity to weigh in.

*Second*, the Frontieres contend there is no evidence they had the requisite scienter for Peters's securities fraud claims. For New Mexico securities fraud, sellers of securities have the burden of showing that they "did not know and, in the exercise of reasonable care, could not have known of the untruth or omission." NMSA 1978, § 58-13C-509(B) (2010).[6] Because New Mexico places the burden of establishing a lack of scienter on the Frontieres, *not* Peters, it is improper for the Frontieres to contend Peters must bring forward evidence of scienter on summary judgment.

For federal securities fraud, however, a plaintiff bears the burden of proving a defendant's scienter. Scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud." *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1435 (10th Cir. 1988). "Scienter is not limited to situations in which a defendant acted with the primary purpose of misleading shareholders; scienter also exists when a defendant acted with a reckless disregard of a substantial likelihood of

---

[6] The Frontieres misstate New Mexico law. According to the Frontieres, Peters needs to show he did not know the statements were untrue and that "in the exercise of reasonable care, could not have known of the untruth or omission." **Docs. 187 at 12; 186 at 12**. This is not what the statute says. Rather, the New Mexico Uniform Securities Act places the burden to prove a lack of scienter on sellers, not buyers. § 58-13C-509(B) ("A person is liable to the purchaser if the person sells a security in violation of Section 301 of the New Mexico Uniform Securities Act or, by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances pursuant to which it is made, not misleading, the purchaser not knowing the untruth or omission *and the seller not sustaining the burden of proof that the seller did not know and, in the exercise of reasonable care, could not have known of the untruth or omission*.") (emphasis added).

misleading investors." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015). The Supreme Court has noted the "difficulty of proving the defendant's state of mind" and that "circumstantial evidence can be more than sufficient" to prove scienter. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 391 n.30 (1983). "[C]ourts are cautious about resolving questions of intent in summary-judgment proceedings." *Havens v. Colorado Dep't of Corr.*, 897 F.3d 1250, 1271 (10th Cir. 2018).

According to the Frontieres, "There are no facts in the record indicating [the Frontieres] possessed knowledge of any undisclosed facts – particularly concerning Tarsin Mobile financial records – before [Peters] executed the Note and Security Agreement on July 19, 2019." **Doc. 186 at 14**. Because the Frontieres argue no evidence exists on an essential element of Peters's claim, Peters must point to evidence from which the Court can reasonably infer the Frontieres had the requisite scienter. The Frontieres focus their challenge on evidence of scienter *before* Peters executed the Note. Because this is how the Frontieres frame their argument, the Court discusses only Peters's evidence of the Frontieres' scienter before the Note was executed.[7]

Peters identifies various material misrepresentations and omissions made by the Frontieres before he signed the Note. These misrepresentations include the following:

- Lord Cultural made around $10 million a year. **Doc. 200-2 at 3–4**.

- Nicholas Frontiere's software would be combined with existing operations of Lord Cultural. **Docs. 200-2 at 3**, **206-10 at 66:8–11**.

- Nicholas' software would increase the value of the company from $1.00 per share to $17.50 per share after the initial public offering. **Docs. 206-16 at 41:4–25, 200-2 at 4, 206-10 at 81: 1–14, 190**.

---

[7] Peters also relies on misrepresentations and omissions the Frontieres made to him *after* he signed the Note but before he wired Tarsin the $750,000. By only discussing the statements made before the signing of the Note, the Court is not implicitly ruling that statements or omissions made after the signing of the Note are not actionable. Without briefing on the matter, the Court will not *sua sponte* limit the timeframe within which statements are actionable.

- Peters was being offered a special, limited-time, friends-and-family opportunity to buy Tarsin stock at $1.00 per share. **Doc. 200-2 at 4, 5.**

- Peters would be guaranteed his money back with 5% interest within twelve (12) months. **Doc. 200-2 at 4**.

- In July of 2019, Tarsin was close to raising the $10 million needed to complete the deal between Tarsin and Lord Cultural. **Doc. 206-10 at 70:12–25; 72:7–23**.

- Peters needed to move quickly because Tarsin needed to complete the deal with Lord Cultural as soon as they could. **Doc. 206-10 at 72:7–23**.

- Nicholas Frontiere had conducted extensive due diligence before making his own investment in Tarsin. **Doc. 200-2 at 4**.

Peters also identifies several material omissions. For example, the Frontieres' failure to inform Peters that Tarsin had recently gone through bankruptcy proceedings, **doc. 200-13 at 109:5–10**, and that Lord Cultural made nowhere near $10 million a year, *id.* at 173:3–174:5.

Recall, federal securities fraud requires a defendant have "the primary purpose of misleading" investors or act "with a reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun*, 782 F.3d at 1150. Peters has made a sufficient evidentiary showing such that the Court can draw the reasonable inference that the Frontieres had the requisite scienter.

First, Peters claims the Frontieres represented to him that Lord Cultural made $10 million a year. According to Peters, this representation was made by Joseph Frontiere at lunch on July 15, 2019, and then confirmed by Nicholas Frontiere over the phone. **Doc. 200-2 at 4** ("Nicholas confirmed everything Joseph said, reassured me it was a safe deal and that Tarsin was a solid, existing company with a great business model that they were going to grow."). Peters signed the Note on July 19, 2019. Five days later, the Frontieres received an email from Lee Hanson with Lord Cultural's Profit and Loss statements, which showed Lord Cultural made nowhere near $10 million a year. **Docs. 189-8, 189-9**. From this email, the Frontieres had access to information that Lord Cultural operated at a loss of $1.6 million in 2017, made less than $200,000 in 2018, and

was not projected to make more than six figures for the foreseeable future. **Doc. 189-9**. The Frontieres contend they did not know anything about Lord Cultural's financials when they solicited Peters's investment and therefore lacked scienter. But even if the Frontieres did not know the exact financial details of Lord Cultural before Peters signed the Note, there is no reasonable basis for the Frontieres' belief that Lord Cultural made $10 million a year. Moreover, there is no indication that this information came as a shock to the Frontieres or that they made any effort to rectify their prior misrepresentation. Instead, a day after the Frontieres received the email from Mr. Hanson, the Frontieres continued to pressure Peters to wire the $750,000 to Tarsin. **Doc. 200-2 at 4-5**. These facts, combined with the fact that Joseph and Nicholas had met with Tarsin executives in June of 2019 and had become a part of the Tarsin management team in July of 2019, **doc. 184-2**, allow the Court to draw the reasonable inference that when the Frontieres told Peters that Lord Cultural earned $10 million a year, they either intended to mislead him or acted with a reckless disregard of a substantial likelihood of misleading him.

Next, Peters claims he was told by the Frontieres that Nicholas Frontiere's software would be combined with existing operations of Lord Cultural and that Nicholas's software would increase the value of Tarsin from $1.00 per share to $17.50 per share after the initial public offering. **Docs. 200-2 at 3, 4**; **206-10 at 41:4–25; 66:8–11; 190**. According to Peters, there is no factual support for the Frontieres' representation that $1.00 per share was a low share price for Tarsin or that the share price would increase to $17.50 per share after the initial public offering because of Nicholas Frontiere's software. If fact, Joseph Cellura had explicitly communicated to Joseph Frontiere that the stock was valued at $0.51 in July or 2019. **Doc. 200-2 at 5.** And Peters's expert and certified public accountant Ron Seigneur "could not find evidence of financial status or activities to support Tarsin executives' claim that Tarsin was on the verge of an [initial public

offering] with an expected 17.5X return on investment." **Doc. 200-10 at 12, 35–38; Doc. 200-11 at 186:13–187:10**. Other evidence also supports the reasonable inference that the Frontieres knew Tarsin was not on the verge of a highly lucrative initial public offering. For example, the Frontieres were aware—at least two weeks before they spoke with Peters—that Tarsin had recently gone through bankruptcy proceedings from November 29, 2017, to January 2019. **Doc. 184-1 at 4**. Yet the Frontieres did not inform Peters of Tarsin's recent bankruptcy. The Frontieres also did not inform Peters that Tarsin was not a publicly reporting company, despite the Frontieres being informed of this by Joseph Cellura on July 1, 2019. **Docs. 189-3, 184-1 at 3**. And despite the Frontieres' emphasis that Nicholas Frontiere's software would play an important role in the success of Lord Cultural and Tarsin, Mr. Ghiselli testified that no work was ever delivered to Tarsin under the "Application Development Agreement" entered into between Tarsin and the Frontieres. **Docs. 184-19, 184-28 at 2-3.**

There is also sufficient evidence in the record from which a reasonable jury could find the Frontieres knew or recklessly disregarded the facts that Tarsin was neither days away from an initial public offering nor was Tarsin close to raising $10 million. In fact, in July of 2019, Tarsin appears to have had no revenue and no assets of any kind. **Doc. 200-12 at 23:18–25** (Deposition of Joseph Cellura) ("Q. . . . What would you estimate was Tarsin's value in July of 2019? A. It would be arbitrary. Q. What does that mean? A. It would not be based on revenues because there were none. It would not be based on income because there was none."); *id.* **at 26:11–14** ("Q. But other than some written agreements, there weren't any tangible assets to back up a valuation? A. No, it was development stage."); **Doc. 200-13 at 290:17–19** (Deposition of Michael Ghiselli) ("Q. Okay. What – how much money has Tarsin Mobile made since you've been there? A. Oh,

nothing."). Peters's expert, Mr. Seigneur, testified that he could not find any evidence that Tarsin was close to an initial public offering. **Doc. 200-10 at 12, 35–38; Doc. 200-11 at 186:13–187:10**.[8]

   ***Third***, the Frontieres argue Peters's federal securities fraud claim must be dismissed because there is no evidence Peters relied on the alleged misrepresentations or omissions when choosing to invest $750,000 in Tarsin. For material misrepresentations, Peters must show justifiable reliance. *See Erica P. John Fund, Inc.*, 563 U.S. at 810 (including reliance as a required element for federal securities fraud). The Frontieres' make two arguments: (1) Peters "fails to provide any evidence that he relied on any of the alleged misrepresentations made by the Frontieres," **doc. 210 at 16**, and (2) there is no dispute as to material facts on the topic of Peters's reasonable reliance. Both arguments fail.

   As to the first argument, Peters makes a sufficient evidentiary showing under the eight reliance factors. The relevant reliance factors are as follows:

> (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1516 (10th Cir. 1983).

---

[8] In Reply, the Frontieres attempt to change their scienter challenge from an argument that the record lacks any evidence on this essential element to an argument that undisputed material facts—which the Frontieres only reference in the Reply—support summary judgment on the issue of scienter. *See* **Doc. 210 at 11-12**. To preserve this argument, the Frontieres were required to raise it in their initial motions. *See M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 (10th Cir. 2009) ("[A] party waives issues and arguments raised for the first time in a reply brief.").

### 1.     The sophistication and expertise of plaintiff in financial and securities matters

Peters cites evidence that he has minimal experience investing in businesses he did not create himself, **doc. 188-3 at 28:17–29:25**; that he has very little experience investing, has no self-managed portfolios, and does not own a stock portfolio, **id.**; that when Peters invested in other venture capital opportunities, he did so based on long-term relationships with the people involved and his trust in those individuals, **doc. 200-2 at 12**; and that the Frontieres' retained expert in forensic accounting testified that experience in business is not synonymous with experience in investing, **doc. 200-1 at 64:20–22**. A reasonable jury could find Peters was not sophisticated or expert in financial and securities matters.

### 2.     The existence of long-standing business or personal relationships

Peters cites evidence that both Nicholas and Joseph Frontiere admit they had a "long-term" relationship with Peters, **docs. 186 at 20, 187 at 21**; that Peters had known the Frontiere brothers since their birth, **doc. 206-2 at 36:2–20**; and that the Frontieres were close enough with Peters that they knew they could use his place of business while Peters was away on vacation, stay in his New York home, that Peters would meet them with little to no notice, and that Peters would respond to a desperate call for help late at night, **docs. 206-13, 184-23, 206-14, 206-15**. A reasonable jury could find Peters and the Frontieres had a longstanding personal relationship.

### 3.     Access to the relevant information

Peters cites evidence that Tarsin CEO Mr. Cellura testified that Tarsin was not reporting financial information publicly when Peters was approached by the Frontieres to invest, **doc. 189-3**; and that although the Frontieres had access to a substantial amount of financial information about Tarsin, the only information they gave Peters—besides their verbal representations—was

the Note, and then two investor pitch decks, **docs. 184-13 at 133:13–23, 184-24 at 191:5–192:5.** Peters has brought forward sufficient evidence on this factor.

> 4.      **The existence of a fiduciary relationship.**

Peters does not argue this factor, but Peters need not present evidence on each factor because "[n]o single factor is determinative." *Zobrist*, 708 F.2d at 1516.

> 5.      **Concealment of the fraud**

Peters cites evidence that the Frontieres told Peters he would receive information about "the secret parts of the company" and "the full [pitch] deck once it is completed" after he signed the Note, **doc. 200-8**; and that the Frontieres had access to financial information about Tarsin and Lord Cultural but only gave Peters the Note and later the investor pitch decks, **docs. 184-13 at 133:13–23, 184-24 at 191:5–192:5**. Peters cites sufficient evidence on this factor.

> 6.      **The opportunity to detect the fraud**

The same evidence that supports Peters's lack of access to information (factor three) and the concealment of the alleged fraud (factor five) also suggests Peters did not have an opportunity to detect the fraud. A reasonable jury could find in his favor on this factor.

> 7.      **Whether plaintiff initiated stock transaction or sought to expedite transaction.**

Peters cites evidence that the Frontieres approached Peters with the opportunity to invest in Tarsin, **docs. 184-6, 200-2**, and that the Frontieres pressured him to invest quickly because the opportunity to invest at $1.00 per share would soon cease, **doc. 206-16 at 47:18–48:9**. This is more than enough for a reasonable jury to find Peters did not initiate or seek to expedite the transaction.

8.      **The generality or specificity of the misrepresentations**

Each of the alleged misrepresentations discussed earlier are specific misrepresentations of fact. Thus, Peters has made a sufficient showing on this factor as well.

A reasonable jury could find Peters relied on the Frontieres' misrepresentations. And the Frontieres' contention that no genuine dispute of material fact exists on this issue is plainly contradicted by Peters's response.

Peters also points out that this case involves material omissions and that "positive proof of reliance is not a prerequisite to recovery" for material omissions. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). The Court agrees. "Although a plaintiff in a Rule 10b–5 action bears the burden of proving reliance on a misrepresentation," the Tenth Circuit has held, "a different burden of proof applies when a case primarily rests on a failure to disclose." *Grubb v. Fed. Deposit Ins. Corp.*, 868 F.2d 1151, 1163 (10th Cir. 1989). "In such a case, reliance on the omission is presumed when the plaintiff establishes that the defendant withheld material information and that the defendant owed the plaintiff a duty to disclose." *Id.* Peters points to evidence that the Frontieres had material financial information about both Tarsin and Lord Cultural but withheld that information from Peters. Specifically, the Frontieres failed to inform Peters that Tarsin had recently gone through bankruptcy and that Lord Cultural made nowhere near $10 million a year. Because reliance on a material omission is presumed, Peters need not show reliance on these omissions to defeat summary judgment.

Counts I and II survive summary judgment.

**Count III:      Common Law Fraud Claim**

The Frontieres also move for summary judgment on Peters's common law fraud claim. In New Mexico, the "elements of fraud include (1) a misrepresentation of fact, (2) either knowledge

of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation." *Williams v. Stewart*, 2005-NMCA-061, ¶ 34, 112 P.3d 281, 290; *see also* NMRA Civ. UJI 13-1633. "[O]rdinarily claims of fraud present an issue of fact which cannot be determined on motion for summary judgment." *Lotspeich v. Golden Oil Co.*, 1998-NMCA-101, ¶ 10, 961 P.2d 790, 792 (citation omitted).

  *First*, the Frontieres contend their alleged misrepresentations are not actionable because the alleged misrepresentations were "statements of opinions and future intent" and therefore do not qualify as misrepresentations of fact. **Docs. 186 at 15, 187 at 19**.[9] However, New Mexico recognizes exceptions to the general rule that "an action for fraud will ordinarily not lie as to a pattern of conduct based on promises that future events will take place." *Reg. v. Roberson Const. Co.*, 1987-NMSC-072, ¶ 10 741 P.2d 1364, 1367. For example, a promise that future events will take place may be actionable "where the promises are based on contrary facts peculiarly within the promisor's knowledge or where the promise is based on a concealment of known facts." *Id.* (internal citations omitted). "Further, if the promise as to future events is part of an overall pattern designed to lead a party to act to his/her detriment, and in such a way as harmfully to alter a legal right possessed by the party, then promises as to future actions will support an action for fraud, especially in a situation where the defendant states an opinion or belief as to future occurrences which are shown to have had no support by the facts at the time the opinions or beliefs were given." *Id.* (internal citation omitted).

---

[9] To support their argument on this point, the Frontieres cite only a single Utah Supreme Court case and two Utah Court of Appeals cases. To state the obvious, this Court is not bound by decisions of Utah state appellate courts. And the Frontieres fail to explain why the Court should consider out-of-state authority on a question of New Mexico law.

Here, the Frontieres allegedly made numerous factual misrepresentations *before* he signed the Note. Peters also asserts that the Frontieres made material misrepresentations and omissions *after* he signed the Note but before he wired the $750,000 to Tarsin. For example, on July 24, 2019—five days after Peters signed the Note and two days before Peters wired the money to Tarsin—Joseph Frontiere emailed Peters an investor pitch deck. This pitch deck listed Nicholas and Joseph Frontiere as part of the management team and showed various other real estate and hospitality projects and companies. **Docs. 184-21, 184-22 at 24, 28**. Within an hour of emailing the investor pitch deck, Joseph also texted Peters this message: "I sent a deck with a summary of the Tarsin holdings. Tarsin owns them all and is having an IPO which you got in on early." **Doc. 184-23**. This too was not true. Tarsin had no formal agreement with any of the companies listed in the pitch deck. **Doc. 200-13 at 152:2–10, 173:3–174:5**. Moreover, the Frontieres' own retained expert Mr. Baca testified, "I could not relate the pitch deck to any financial information or any plan, or any other document." **Doc. 200-1 at 79:4–5**. In fact, in July of 2019, Tarsin had no revenue and no assets of any kind. **Doc. 200-12 at 23:18–25, 26:11–14**; **Doc. 200-13 at 290:17–19**.

The Court concludes the alleged misrepresentations are actionable either because they are *not* statements of opinion or future promises or because the statements fall within New Mexico's exception discussed above because many of the statements seemingly "had no support by the facts at the time the opinions or beliefs were given." *Roberson Const. Co.*, 1987-NMSC-072, ¶ 10.

**Second**, the Frontieres contend they lacked the required scienter for common law fraud—i.e., that they did not know of the falsity of the representation or act recklessly in making the misrepresentation. For the same reasons a reasonable jury could find the Frontieres had scienter for federal securities fraud, a reasonable jury could also find scienter for Peters's common law

fraud claim. As to Nicholas Frontiere's claim that evidence shows a lack of scienter on his part, **doc. 186 at 16–17**, the Court finds genuine issues of material fact preclude summary judgment.

*Third*, the Frontieres argue there is no evidence Peters reasonably and materially relied on the Frontieres' statements. The record shows otherwise. Pivotal to the Frontieres' argument is their contention that "[d]etailed financial information was available for [Peters] to review even prior to signing the Note Documents on both the Tarsin Mobile and OTC Markets websites." **Docs. 186 at 18, 187 at 18**. Additionally, the Frontieres argue that Peters's reliance on the Frontieres' statements was unreasonable because he "had ample opportunity, the professional experience, and the necessary resources to detect any fraud being perpetrated." **Docs. 186 at 20–21, 187 at 21**. In short, Peters "could have taken some due diligence measures, but did not." **Doc. 186 at 21**.

If counsel for the Frontieres had researched and presented New Mexico caselaw to the Court—rather than Utah and Ninth Circuit caselaw—perhaps Frontieres' counsel would have confronted the reality that New Mexico law does not require due diligence to find reliance. In New Mexico, there is no set test for whether a party's reliance is justified; rather, the New Mexico Court of Appeals has held that justifiable reliance "is fact-specific and includes consideration of the conduct of both parties." *Jones v. Auge*, 2015-NMCA-016, ¶ 33, 344 P.3d 989, 998 (citation omitted). Relevant here, the New Mexico Court of Appeals has held, "A recipient [of a misrepresentation]'s fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." *Sisneros v. Citadel Broad. Co.*, 2006-NMCA-102, ¶ 21, 142 P.3d 34, 40 (citation omitted). In fact, the New Mexico Court of Appeals has gone so far as to suggest justifiable reliance can be found even when a plaintiff himself is negligent and even when a plaintiff is given a document but fails to read it. *See e.g.*, *Jones*, 2015-NMCA-016, ¶ 32, 344

P.3d at 998 ("Because a fraudulent misrepresentation is an intentional tort, the plaintiff's recovery is not barred by his own negligence which has contributed to his loss.") (brackets, quotation marks, and punctuation omitted); *see also Sisneros*, 2006-NMCA-102, ¶ 23, 142 P.3d at 41 ("Plaintiff has produced evidence giving rise to factual inferences that could reasonably support the determination that his failure to read the agreement was justified by Citadel's conduct.").

The Frontieres assert that justifiable reliance for New Mexico fraud claims is determined based on the eight-factor test for federal securities claims previously discussed.[10] This is not New Mexico's test. Still, the evidence that would support reliance for Peters's federal securities claim would likewise support a jury's finding of justifiable reliance. And to the extent the Frontieres contend undisputed facts support summary judgment on reliance, they are mistaken.

Finally, Nicholas Frontiere maintains Peters's common law fraud claim must fail because Nicholas had no duty to disclose the alleged material facts to Peters. Both parties agree New Mexico law recognizes that "where one is under a duty to speak but remains silent and fails to disclose a material fact, he may be liable for fraud." *R.A. Peck, Inc. v. Liberty Fed. Sav. Bank*, 1988-NMCA-111, ¶ 9, 766 P.2d 928, 932. As Nicholas Frontiere points out, generally the existence of a duty is a question of law for the trial court to decide. *Id.* ¶ 12. But the Court cannot decide a question of law at summary judgment based on a disputed factual record. *Azar v. Prudential Ins. Co. of Am.*, 2003-NMCA-062, ¶ 43, 68 P.3d 909, 923 (explaining that when the facts on which the alleged duty rests are in dispute, the existence of a duty becomes a mixed question of law and fact and disputed issues of fact underlying the duty question must be submitted

---

[10] To support this assertion, the Frontieres cite to an unpublished federal district court case out of the district of Kansas dealing with federal securities law claims. **Docs. 187 at 20, 186 at 20**. Such a case citation does not provide any basis whatsoever on which the Court could rule for the Frontieres.

to the factfinder for resolution). Here, whether Nicholas Frontiere had a duty to disclose information involves genuinely disputed issues of material fact; thus, summary judgment is inappropriate. While Mr. Frontiere is free to raise this issue at trial, summary judgment against Peters's common law fraud claims is denied.

### Count IV:    Negligent Misrepresentation

The Frontieres also take aim at Peters's claim for negligent misrepresentation. In New Mexico "to recover under the claim of negligent misrepresentation plaintiffs must show (1) that defendants made a material misrepresentation of fact to plaintiffs, (2) that plaintiffs relied upon such representation, (3) that defendants knew the representation was false at the time it was made or made it recklessly, and (4) that defendants intended to induce plaintiffs to rely on such representation." *Saylor v. Valles*, 2003-NMCA-037, ¶ 17, 63 P.3d 1152, 1158. "A negligent misrepresentation is one where the speaker has no reasonable ground for believing that the statement made was true." *Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.*, 1991-NMSC-097, ¶ 13, 820 P.2d 1323, 1327. !

In less than a page, the Frontieres challenge the negligent misrepresentation claim on the same grounds they challenge Peters's other three fraud claims. According to the Frontieres, "The critical deficits of [Peters's] fraud claims require dismissal of [his] negligent misrepresentation claim." **Docs. 186 at 22, 187 at 21–22.** The Frontieres make two cursory arguments: (1) the Frontieres provided information about Tarsin only after Peters signed the Note; thus, Peters cannot claim he relied on that information when agreeing to invest; and (2) any alleged omissions are obviated by the public availability of information, which Peters could have easily accessed.

As previously discussed, Peters points to various statements the Frontieres made *before* he signed the Note. Thus, the Frontieres' first argument fails. As to the second argument, the

Frontieres do not provide evidence of what information was publicly available and where such information was accessible. The Frontieres' representation that detailed financial information was available to Mr. Peters before he signed the Note in July of 2019 on both the Tarsin Mobile and OTC Market websites is not supported by the record. The Frontieres provide the link to two websites, neither of which allow the Court to find the information the Frontieres claim is available. The Court is also unsure how one could be sure information currently available on a website was in fact available in July of 2019. The public availability of the information in question is a disputed issue of fact, so the Frontieres have not carried their initial summary judgment burden. *See* **Doc. 189-3** (email from Joseph Cellura to Frontieres) ("We have not been a reporting company due to the confidentiality of a lot of our development . . . ."); *see also* **Doc. 184-1 at 3** (Tarsin Mobile OTC Disclosure Statement). Further, even assuming some information was publicly available, the Frontieres have provided the Court with no legal basis on which to conclude that public availability of some information should undermine Peters's reliance on the Frontieres' alleged negligent misrepresentations. The Court denies the Frontieres' motions as to Count IV.

### Count VII:    Civil Conspiracy Claim

Next, the Frontieres urge the Court to grant summary judgment in their favor on Peters's civil conspiracy claim "because the underlying claims for fraud and negligent misrepresentation are dismissible as a matter of law." **Docs. 186 at 23, 187 at 23.** The Court has concluded otherwise, as discussed in previous sections of this opinion. Because the Court has determined Peters has actionable securities fraud, common law fraud, and negligent misrepresentation claims, the Frontieres' argument is unavailing. Peters's civil conspiracy claim survives.

**Counts VIII, IX:**      **Accounting & Imposition of a Constructive Trust**

The Frontieres also seek dismissal of Peters's requests for an accounting and the imposition of a constructive trust. Both an accounting and the imposition of a constructive trust are equitable *remedies*—not equitable claims. *Heimann v. Kinder-Morgan CO2 Co., L.P.*, 2006-NMCA-127, ¶ 20, 144 P.3d 111, 117 ("An accounting and an injunction are remedies only and do not constitute independent claims for the purpose of this analysis."); *In re Est. of Duran*, 2003-NMSC-008, ¶ 35, 66 P.3d 326, 338 ("The imposition of a constructive trust is an equitable remedy, and as such is within the broad discretion of the district court."). Accordingly, the Court need not pass on whether Peters is entitled to a particular remedy when liability has yet to be determined. In addition, there is no merit to the Frontieres' contention that Peters cannot request equitable remedies because he has an adequate remedy at law. Just as a plaintiff can plead alternative claims, a plaintiff can plead alternative remedies. *See Figueroa v. Ethicon, Inc.*, No. 219CV01188KWRKRS, 2020 WL 1434249, at *3 (D.N.M. Mar. 24, 2020) (declining to dismiss equitable claim because "it is unclear at this time whether Plaintiff has an adequate remedy at law."). Summary judgment as to the remedies described in Counts VIII and IX is denied.[11]

**Count X:**      **Promissory Estoppel**

Finally, the Frontieres request that the Court grant summary judgment on Peters's promissory estoppel claim. In New Mexico, promissory estoppel requires the following elements:

> (1) An actual promise must have been made which in fact induced the promisee's action or forbearance; (2) The promisee's reliance on the promise must have been reasonable; (3) The promisee's action or forbearance must have amounted to a substantial change in position; (4) The promisee's action or forbearance must have been actually foreseen or reasonably foreseeable to the promisor when making the

---

[11] The Court also notes that if the Frontieres challenge the award of an accounting in the future, they must cite New Mexico law or explain why they are not doing so. The Tenth Circuit case interpreting Oklahoma law that the Frontieres cite in their briefing, **docs. 186 at 24, 187 at 23**, is persuasive authority at best.

promise; and (5) enforcement of the promise is required to prevent injustice.

*Magnolia Mountain Ltd., P'ship v. Ski Rio Partners, Ltd.*, 2006-NMCA-027, ¶ 25, 131 P.3d 675,

682–83. Although neither party clearly explains what promise is at issue, the promise—according

to Peters's Amended Complaint—is Joseph and Nicholas Frontieres' promise to Peters "that by

trusting their financial advice, [Peters] would receive a return of at least 17 times the value of his

initial investment in [Tarsin] and that investing quickly was critical to receiving these returns."

**Doc. 9 ¶ 140.** Based on this promise and relying on his relationship with the Frontieres, Peters

alleges he wired "$750,000 to [Tarsin]." *Id.* **¶ 141.** The Frontieres urge the dismissal of Peters's

promissory estoppel claim for two reasons: (1) the Note governs Peters's investment in Tarsin;

thus, Peters cannot seek promissory estoppel; and (2) Peters cannot show he reasonably relied on

the Frontieres' promise. **Docs. 187 at 26, 186 at 26.**

The Frontieres' first argument, yet again, puts the cart before the horse. Certainly, New

Mexico law dictates that equitable claims do not come into play if there is an adequate remedy at

law. *See Ontiveros Insulation Co. v. Sanchez*, 2000-NMCA-051, 3 P.3d 695, 699 ("Simply, equity

does not take the place of remedies at law, it augments them; in this regard, an action in contract

would be preferred to one in quasi-contract."); *see also Sims v. Sims*, 1996-NMSC-078, ¶ 28, 930

P.2d 153, 159 ("[E]quity will not act if there is a complete and adequate remedy at law."). But that

does not mean Peters cannot plead both a breach of contract claim against the Tarsin Defendants

and a promissory estoppel claim against the Frontieres, especially since Peters's breach of contract

claim deals with the Note promise that Tarsin would "repay Peters's $750,000 plus interest one

year from execution of the Promissory Note," **doc. 9 ¶ 114,** whereas the promissory estoppel claim

deals with the promise by the Frontieres that Peters "would receive a return of at least 17 times the

value of his initial investment in [Tarsin]," **doc. 9 ¶ 140.**

As to the Frontieres' second argument, evidence of Peters's reliance discussed earlier is enough for a reasonable jury to find in favor of Peters on this claim as well. To the extent the Frontieres urge the Court to grant them summary judgment based on Peters being "an experienced and prominent Santa Fe businessman who has transacted many millions of dollars in banking, art gallery and land development projects," **doc. 186 at 26**, the Court concludes genuine issues of material fact preclude summary judgment. Thus, Count X survives summary judgment.

## CONCLUSION

Defendant Nicholas Frontiere's and Defendant Joseph Frontiere's Motions for Summary Judgment (**Docs. 186, 187**) are **DENIED** for the reasons stated in this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

_____

CHIEF UNITED STATES DISTRICT JUDGE