## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

_____

GERALD PETERS,

       Plaintiff,

                                No. 1:21-cv-00564-WJ-JMR

    v.

JOSEPH FRONTIERE, NICHOLAS
FRONTIERE, MICHAEL GHISELLI,
JOSEPH CELLURA, and TARSIN
MOBILE, INC.,

       Defendants.

JOSEPH FRONTIERE and NICHOLAS FRONTIERE,

       Cross-Claimants,

v.

MICHAEL GHISELLI, JOSEPH CELLURA,
and TARSIN MOBILE, INC.,

       Crossclaim Defendants.

### MEMORANDUM OPINION AND ORDER DENYING TARSIN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      **THIS MATTER** is before the Court on Defendants Michael Ghiselli, Joseph Cellura, and Tarsin Mobile, Inc.'s (collectively "Defendants" or "Tarsin Defendants'") Motion for Summary Judgment. The Tarsin Defendants request the dismissal of all Plaintiff Gerald Peters' claims against them. Having considered the parties' briefing and the applicable law, the Court concludes Defendants are not entitled to summary judgment. The Motion (**Doc. 188**) is therefore **DENIED**.

1

# BACKGROUND[1]

Gerald Peters ("Peters") is a well-known gallery owner and businessman in Santa Fe, New Mexico. It is undisputed that Peters invested $750,000 in Tarsin Mobil, Inc. ("Tarsin"[2]) in July of 2019. Peters first learned of this investment opportunity from Joseph and Nicholas Frontiere, the sons of one of Peters's close friends. **Doc. 200-19 at 113:18–114.08.** Peters has known Joseph and Nicholas since they were children. **Doc. 200-3 at 13:25–14:4; 14:10–16.** Peters' wife testified that she took Joseph and Nicholas camping throughout their childhood. **Doc. 200-18 at 8:7–22.** The Frontieres' mother also testified that Peters's wife often took the Frontiere boys fishing when they were children, that Peters's wife took Nicholas to Europe, and that Nicholas considered himself a part of the Peters family. **Doc. 200-5 at 13:08–22**. As the Frontiere brothers grew up, they moved away from Santa Fe, but Peters still saw them once or twice a year when they were in town. The relationship between the Frontieres and Peters remained strong. For example, the Frontieres felt comfortable using the Peters Gallery conference room while Peters was away on vacation, **doc. 206-13**, staying at Peters's house in New York, **doc. 184-23**, asking Peters to meet with them on short notice, **doc. 206-14**, and calling and texting Peters with emergencies in the middle of the night, **doc. 206-15**.

In June 2019 the Frontieres became involved with Tarsin Mobile Inc. Tarsin was a technology, hospitality, and entertainment company. Before joining Tarsin's management team, the Frontieres had several meetings with top Tarsin executives. On June 14, Joseph Cellura—

---

[1] For purposes of the Motion, the background facts are either uncontroverted, or, where genuinely controverted, are viewed in the light most favorable to Peters, the party opposing the grant of summary judgment. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 964 (10th Cir. 2022).

[2] The parties refer to Tarsin Mobile, Inc. as both "Tarsin" and "TMIX." For simplicity and to avoid confusion, the Court refers to Tarsin Mobile, Inc. as "Tarsin."

Tarsin's CEO—emailed Joseph Frontiere financial information about Tarsin and Lord Cultural. **Docs. 189-1, 189-2**. Lord Cultural was a company in the field of art and museums that Tarsin was considering acquiring and taking through an initial public offering. **Docs. 200-2 at 1, 200-19 at 70:12–17, 188-1 at 230:14–232:10.** Joseph Frontiere also met with Mr. Cellura and Lee Hanson, another Tarsin executive, in Santa Fe, New Mexico in mid-June 2019. **Doc. 184-2**. Nicholas Frontiere participated in the meeting remotely. **Doc. 184-3 at 34:03–13**. On July 1, 2019, Mr. Cellura emailed Joseph and Nicholas Frontiere a brief history of Tarsin, including an explanation that Tarsin was not a publicly reporting company. **Docs. 189-3, 184-1 at 3.** Also on July 1, 2019, Lee Hanson emailed Joseph and Nicholas Frontiere a disclosure statement for Tarsin, explaining that Tarsin had gone through bankruptcy proceedings between November 29, 2017, and January 2019. **Doc. 184-1 at 4**. By July 9, 2019, the Frontieres had arranged an ownership stake in Tarsin, and Mr. Cellura emailed the Frontieres a table confirming that Nicholas had a ten percent (10%) interest, and Joseph had a five percent (5%) interest in Tarsin. **Doc. 189-7**. The table also identified "Joey Frontiere" and "Nicky Frontiere" as Tarsin executives. *Id.*[3]

On July 15, 2019, the Frontieres approached Peters with the opportunity to invest in Tarsin. **Docs. 200-2, 184-6**. Joseph Frontiere and Peters met for lunch in Santa Fe. During this lunch, the discussion focused on Tarsin's merger with Lord Cultural. **Doc. 200-2 at 3.** Joseph Frontiere held Lord Cultural out to Peters as "an established, highly profitable, operating company in the field of art and museums that made around $10 million a year." **Doc. 200-2 at 3**. Joseph also claimed "his brother Nicholas's software was being combined with the existing operations of Lord Cultural." *Id.* Additionally, Joseph Frontiere told Peters that Peters "had to move quickly because they had

---

[3] Nicholas Frontiere and Joseph Frontiere are referred to in various documents as "Nicky" and "Joey."

to complete their deal with Lord Cultural immediately." *Id.* Joseph Frontiere explained that Tarsin was well on its way to raising the $10 million needed to complete the deal with Lord Cultural, and that Peters "had to hurry before the opportunity sold out." *Id.* **3–4.**

After the lunch, Peters reached out to Nicholas Frontiere to verify what Joseph had told him. *Id.* **at 4.** Nicholas confirmed everything Joseph had said at lunch and reassured Peters that "it was a safe deal and that Tarsin was a solid, existing company with a great business model that they were going to grow." *Id.* Nicholas also told Peters that he had invested $40,000 of his own money in Tarsin and that he had conducted extensive due diligence and that "everything checked out." *Id.* Nicholas went on to explain that he was creating the software that would increase the value of the company after the initial public offering from $1.00 per share to $17.50 per share. *Id.* Peters thought the 17.5 times return on investment "sounded ambitious," but Joseph and Nicholas offered him the reassurance that he would be guaranteed his money back with five percent (5%) interest after one year. *Id.* Joseph and Nicholas also told Peters that "there were details about the company they couldn't talk about yet but that once [Peters] invested, [he] would receive more information." *Id.* *See also* **Doc. 200-8**.

Nicholas' reassurances held particular weight in Peters' mind because of Nicholas' academic and professional successes. At age sixteen, Nicholas began working at Los Alamos National Laboratories. **Docs. 184-22 at 28**, **200-3 at 99:2–8** (Nicholas, "at 16, rewrote the software for a classified satellite we have that tracks weapons grade plutonium . . . . He traded in the stock market, paid for his college. His dad was very proud of that he didn't have to pay for [Nicholas's] college."). Nicholas then graduated summa cum laude from UCLA with degrees in physics and mathematics and went on to earn a Ph.D. in computational physical from the University of Chicago. **Doc. 184-22 at 28**. In 2019, Nicholas had been a multi-year finalist for the Gordon Bell

supercomputing prize and was conducting research for Argonne National Laboratory. *Id.* Peters contends that he trusted Nicholas and relied on his expertise "because Nicholas has an extensive background in technology as well as top-secret clearance working at a national lab." **Doc. 200-2 at 12.** And Peters "explicitly asked Nicholas whether doing these sorts of deals would put his security clearance at risk," and Nicholas reassured Peters that Tarsin was "established, the deal was clean, and that he would never put his career in jeopardy by getting involved in anything risky." **Doc. 200-2 at 13.** According to Peters, "Nicholas had far more to lose than [Peters] did because of his security clearance and so [Peters] relied on the due diligence he told [him] he had performed prior to making his own investment in Tarsin." *Id.*

On July 19, 2019, the Frontieres sent Peters a Promissory Note ("The Note"), which Peters executed and returned the same day. **Docs. 184-14, 184-15, 184-17, 184-18.** In the Note, Peters agreed to invest $750,000 in Tarsin with repayment of the $750,000 plus five percent interest due in twelve months. **Doc. 184-18.** Peters executed the Note on July 19, 2019, but he did not wire transfer the money until July 26, 2019. *See* **doc. 184-25.** According to Peters, after signing the promissory note, he "hesitated to approve the wire transfer because [he] felt uncertain about the investment." **Doc. 200-2.**

On July 22, 2019, Joseph Frontiere sent an email urging Peters to wire the money to Tarsin. **Doc. 200-9 at 4.** Over the next couple of days, the Frontieres sent two investor "pitch decks"[4] to Peters about Tarsin and Lord Cultural. **Docs. 200-2, 200-6, 184-22.** First, on July 23, 2019, Joseph emailed Peters an older pitch deck. **Doc. 200-2.** Then on July 24, 2019, the Frontieres sent Peters an updated Tarsin pitch deck. **Doc. 184-22.** This pitch deck listed Joseph and Nicholas Frontiere

---

[4] The pitch decks appear to be promotional PowerPoint slideshows that use both pictures and words to explain a particular company to prospective investors.

as members of the Tarsin management team—Joseph as "Corporate Finance Director" and Nicholas as "Technology Advisor." **Doc. 184-22 at 24.** The pitch deck referenced many other companies. Based on this pitch deck, Peters felt "comfortable wiring $750,000 because it was clear that there was far more substance behind [Tarsin] than just Lord Cultural. The [pitch deck] showed that Tarsin had a long history of accomplishments and completed projects including real estate development with highly successful business partners such as Universal Music Group and Killian Construction and a very qualified management team." **Doc. 200-2 at 5.** Within an hour of emailing the pitch deck to Peters, Joseph texted Peters saying, "I sent a deck with a summary of Tarsin holdings. Tarsin owns them all and is having an [initial public offering] which you got in on early." **Doc. 184-23.** But according to Mr. Ghiselli's—Tarsin's COO's—later testimony, Tarsin had no agreements with any of the companies listed in the pitch deck at that time. **Doc. 200-13 at 153:2– 10; 173:3–174:5**.

The same day the Frontieres sent the second pitch deck to Peters, Tarsin executive Lee Hanson emailed the Frontieres updated financial information for Lord Cultural. **Docs. 189-8, 189- 9.** Lord Cultural's Profit and Loss statements showed Lord Cultural made nowhere near the $10 million a year that the Frontieres had claimed: In fact, Lord Cultural operated at a loss of $1.6 million in 2017, made less than $200,000 in 2018, and was not projected to make more than six figures for the foreseeable future. **Doc. 189-9**. The Frontieres did not forward this information to Peters or inform him of it. On July 25, 2019, Joseph again texted Peters to urge him to wire the money for the investment "for mine and Nick's meeting in New York." **Doc. 200-2.** Peters finally wired the $750,000 to Tarsin on July 26, 2019. **Doc. 184-25**.

At the time Peters invested, Tarsin appears to have had no revenue and no assets of any kind. **Doc. 200-12 at 23:18–25** (Deposition of Joseph Cellura) ("Q. . . . What would you estimate

was Tarsin's value in July of 2019? A. It would be arbitrary. Q. What does that mean? A. It would not be based on revenues because there were none. It would not be based on income because there was none."); *id.* at 26:11–14 ("Q. But other than some written agreements, there weren't any tangible assets to back up a valuation? A. No, it was development stage."); **Doc. 200-13 at 290:17– 19** (Deposition of Michael Ghiselli) ("Q. Okay. What – how much money has Tarsin Mobile made since you've been there? A. Oh, nothing."). Peters's expert and certified public accountant, Mr. Seigneur, testified that he could not find any evidence that Tarsin was close to an initial public offering. **Doc. 200-10 at 12, 35–38;** *see also* **doc. 200-11 (186:13–187:10)**. And although Peters was led to believe that $1.00 per share was a low price for Tarsin stock, Joseph Cellura explicitly communicated to Joseph Frontiere that the stock was valued at $0.51 per share. **Doc. 200-2 at 5.** Even the Frontieres' claim that Nicholas Frontiere's software would be combined with existing operations of Lord Cultural never panned out.

On July 26, 2019—the same day Peters wire transferred the $750,000 to Tarsin—Tarsin wire transferred $80,000 into Joseph Frontiere's personal bank account. **Doc. 184-26 at 11.** On September 24, 2019, Tarsin entered a service contract with Joseph and Nicholas Frontiere ("Application Development Agreement") through Frontiere Technologies, Inc., which called for $340,000 for the development of a Tarsin Dashboard. **Doc. 184-28 at 2–3.** Tarsin paid $210,000 to Frontiere Technologies, **doc. 184-26 at 26, 68,** and Tarsin made out a cashier's check for $103,000 to Joseph Frontiere, **doc. 184-28 at 7**, but no work was ever performed under this agreement, **docs. 184-19 at 69:4–8, 184-13 at 170:11–20**.

On September 22, 2019, Peters received an email from Mr. Ghiselli—Tarsin's COO— claiming Tarsin needed Peters to fill out a W-9 form for their "transfer agent." **Doc. 200-2 at 17.** This seemed like a strange request to Peters, and he thought it might be a phishing attempt, so he

forwarded the email to his executive assistant. *Id.* His assistant reached out to Tarsin to confirm that it was a legitimate request but received no response. *Id.* By September 30, 2019, the controller for Peters' Corporation began inquiring internally about whether Peters had received any stock certificates to correspond with the $750,000 wire transfer. *Id.* Because Peters stopped receiving any information about Tarsin, including from Joseph and Nicholas Frontiere, Peters contacted his general counsel. *Id.*

On November 26, 2019, Peters sent a letter demanding Tarsin return his investment. **Doc. 188-11.** In response, Mr. Cellura sent Peters an email stating that Tarsin's investment bankers and attorneys had advised him that "Joey Frontiere claims [Peters's $750,000 investment], as well as the investment funds received by Tarsin Mobile, Inc. . . . from other Santa Fe individuals, represents his [meaning Joseph's] personal investment made with money from his family's trust." **Docs. 200-16 at 2**, **200-15.** And on February 24, 2020, Joseph Cellura and Michael Ghiselli told Peters' general counsel that Tarsin intended to pursue claims against Joseph Frontiere. **Doc. 200-17** ("Tarsin intends on pursuing the full prosecution of these claims and will seek imposition of a constructive trust."). In February 2020, Peters reached out multiple times to Joseph Frontiere to ask him to explain what happened to the investment and to try to get his money back. **Doc. 200-2.** Joseph Frontiere never responded. *Id.*

In 2021, Peters filed suit against the Frontieres and the Tarsin Defendants, seeking to recoup his money on the basis that Defendants fraudulently induced him to invest in their company and that the Tarsin Defendants breached the Promissory Note. To this end, Peters brings claims against the Tarsin Defendants for Federal Securities Fraud (Count I), New Mexico Securities Fraud (Count II), Common Law Fraud (Count III), Negligent Misrepresentation (Count IV), Breach of Contract (Count V), Breach of the Covenant of Good Faith and Fair Dealing (Count VI), and Civil

Conspiracy (Count VII). **Doc. 9**. Peters also seeks an accounting (Count VIII) and the imposition of a constructive trust (Count IX), among other remedies. *Id.*

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Est. of Beauford v. Mesa Cnty., Colorado*, 35 F.4th 1248, 1261 (10th Cir. 2022) (citation omitted). "The summary judgment standard requires [the Court] to construe the facts in the light most favorable to the nonmovant and to draw all reasonable inferences in its favor." *Id.*

"The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, but once the moving party has done so, the burden shifts to the non-movant to establish a genuine issue of fact." *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1197 (10th Cir. 2022). A defendant—or party *not* bearing the burden of persuasion at trial—may also move for summary judgment "by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim." *Libertarian Party of NM v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."). When faced with this type of challenge, the nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case." *SEC v. Thompson*, 732 F.3d 1151, 1157 (10th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322).

To make this showing, the nonmoving party must set forth specific facts on which a jury could reasonably find for the plaintiff. *Farnsworth v. Town of Pinedale, Wyo.*, 968 F.2d 1054, 1056 (10th Cir. 1992). These specific facts must be identified by reference to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, and other materials." Fed. R. Civ. P. 56(c)(1)(A). But the nonmoving party need not definitively prove each element; rather, the nonmovant need only establish "an inference of the presence of each element essential to the case." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001). That said, "a complete failure of proof concerning an essential element of the nonmoving party's case" will entitle the movant to judgment as a matter of law. *Celotex*, 477 U.S. at 322–23.

## DISCUSSION

**Counts I & II:          Federal and State Securities Fraud Claims**

The Tarsin Defendants move for summary judgment on Peters's state and federal securities fraud claims. To prove private federal securities fraud, Peters must establish "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). To prove private securities fraud under the New Mexico Uniform Securities Act, Peters must show Defendants sold a security "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made . . . not misleading" and that Peters did not "know[] the untruth or omission." NMSA 1978, § 58-13C-509(B) (2010). Defendants attack Peters's securities claims on two grounds: (1) Peters did not justifiably rely on any of the Frontieres' statements or

10

representations; and (2) the statements are not actionable because they are either true or merely the Frontieres' opinions. The Court is not persuaded.[5]

First, Defendants contend Peters's federal securities fraud claim must be dismissed because Peters did not justifiably rely on the Frontieres' misrepresentations or omissions[6] when investing $750,000 in Tarsin. Reliance is an essential element of a private securities fraud claim. *Erica P. John Fund, Inc.*, 563 U.S. at 810. Proof of a plaintiff's reliance ensures a sufficient connection exists "between a defendant's misrepresentation and a plaintiff's injury." *Id.* "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Id.* The Tenth Circuit considers eight factors when assessing whether a plaintiff justifiably relied on misrepresentations:

> (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

---

[5] Defendants also raise the issue of scienter for the first time in their Reply. **Doc. 217 at 11.** Raising an argument for the first time in Reply precludes the opposing party from responding and prevents reasoned consideration by the district court; thus, the Court concludes Defendants waived this challenge. *See F.D.I.C. v. Noel*, 177 F.3d 911, 916 (10th Cir. 1999) (holding district court properly refused to consider argument raised for first time in reply).

[6] Peters alleges both material omissions and material misrepresentations to support his securities fraud claims. Reliance on omissions "is presumed when the plaintiff establishes that the defendant withheld material information and that the defendant owed the plaintiff a duty to disclose." *Grubb*, 868 F.2d at 1163; *accord Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008). Defendants do not argue that the Frontieres did not have a duty to disclose material information that contradicted their previous representations; thus, the Court need not address this issue. It is enough to conclude that for Peters's material omission allegations, he need not show reliance because it is presumed.

11

*Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1516 (10th Cir. 1983). "Courts and juries must assess all relevant factors; no single factor is determinative." *Id.*

While reliance depends on a weighing of many factors, the Tenth Circuit has also held that a plaintiff cannot "justifiably rely on a misrepresentation when its falsity is palpable" nor can a plaintiff "close [their] eyes and refuse to investigate in disregard of a known risk or a risk so obvious that the plaintiff must be taken to have been aware of it." *Grubb v. Fed. Deposit Ins. Corp.*, 868 F.2d 1151, 1163 (10th Cir. 1989). Stated another way, "[r]eckless conduct by the plaintiff that rises to a level of culpability comparable to the defendant's . . . renders the plaintiff's reliance unjustifiable." *Id.* at 1162–63.

Defendants urge the Court to read into both the federal and state securities fraud statutes a requirement that a plaintiff demonstrate due diligence before buying a security. According to Defendants, Peters was "required to obtain current financial information relating to the proposed securities transaction" before investing. **Doc. 188 at 17**. The Court is not persuaded. Certainly, the sophistication of a plaintiff in securities matters and whether a plaintiff had the opportunity to detect the fraud are two factors the Court considers when assessing justifiable reliance for federal securities fraud, but Peters is not required to provide evidence of due diligence to survive summary judgment.

As for Peters's state claim, Defendants contend the New Mexico Uniform Securities Act places the burden on the plaintiff to show that "in the exercise of reasonable care" the plaintiff "could not have known the untruth or omission." **Doc. 188 at 12**. But Defendants misstate New Mexico law. Contrary to Defendants' contention, New Mexico's securities fraud statute places the burden of exercising reasonable care on *sellers*, not buyers. § 58-13C-509(B) ("A person is liable to the purchaser if the person sells a security in violation of Section 301 of the New Mexico

Uniform Securities Act or, by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances pursuant to which it is made, not misleading, the purchaser not knowing the untruth or omission *and the seller not sustaining the burden of proof that the seller did not know and, in the exercise of reasonable care, could not have known of the untruth or omission*.") (emphasis added). Accordingly, Peters does not need to show due diligence for his New Mexico or federal securities fraud claims to survive.

To the extent Defendants are arguing Peters "refuse[d] to investigate in disregard of a known risk or a risk so obvious that the plaintiff must be taken to have been aware of it," the Court is not persuaded. *Grubb*, 868 F.2d at 1163. Defendants in their Reply, point to Tarsin's OTC Disclosure Statement, which says that Tarsin's "common stock is currently quoted on the over-the-counter market pink sheets with a warning and stop sign as a reminder and warning buyers and sellers of our common shares that the Company does not report and the stock is thinly traded due to the limited number of shares issued and outstanding." **Doc 184-1 at 3.** The Court does not find this warning alone is sufficient for it to conclude that Peters *knew* there was a risk he would lose his $750,000 investment or that the risk was so obvious that Peters must have been aware of it. Defendants point to no other record evidence to support the assertion that Peters acted recklessly when investing in Tarsin.

Defendants also contend undisputed facts entitle them to summary judgment on Peters's securities claims. The Court disagrees. Summary judgment is inappropriate because the facts Defendants rely on are genuinely disputed by Peters. First, Defendants claim Peters failed to read the Promissory Note. **Doc. 188 at 5**. But Defendants provide no record support for this claim; thus, they have not met their initial summary judgment burden. However, even if Defendants had

evidence Peters did not read the Note, it is unclear why this would matter. Certainly, a failure to read could be fatal to Peters's claims if the Note had contained information that directly contradicted the representations the Frontieres had made to him about Tarsin and Lord Cultural. *See e.g.*, *Zobrist*, 708 F.2d at 1518 (holding that investor had not justifiably relied on original misrepresentation that investment contained "no risk" when memorandum provided to investor expressly contradicted misrepresentations). Here, the Note only contained one promise: The promise that Tarsin would repay Peters his $750,000 with five percent interest within one year of the investment. Defendants have not pointed to anything in the Note that would have informed Peters that Tarsin had no revenue or assets at the time, that Lord Cultural did not make $10 million a year, that Nicholas Frontiere's software would not be used to help increase the value of the company, that Tarsin did not own or have partnerships with the companies listed in the investor pitch deck, or that Tarsin was not close to a lucrative initial public offering. Thus, whether Peters read the Note is irrelevant to Peters's securities fraud claims.

Defendants also posit that Peters breached the Promissory Note by failing to permit the Tarsin Defendants to convert Peters's investment. According to Defendants, Peters failed to respond to Mr. Ghiselli's email requesting that Peters execute a W-9 form so that Tarsin could enforce its right of conversion. **Doc. 188 at 7, 13.** Defendants do not point to a particular provision of the Note that Peters allegedly breached, and it is unclear why Peters's alleged breach is relevant to his securities fraud claims. But even if it were relevant, Peters genuinely disputes the alleged breach. According to Peters, on September 22, 2019, he received an email from Mr. Ghiselli claiming Tarsin needed Peters to fill out a W-9 form for their "transfer agent." **Doc. 200-2 at 17**. Peters thought it might be a phishing attempt, so he forwarded the email to his executive assistant. *Id.* His assistant reached out to Tarsin to confirm that it was a legitimate request but received no

response. *Id.* The issue of Peters's breach of the Note is genuinely disputed and of questionable relevancy; thus, it cannot form the basis for summary judgment on Peters's securities fraud claims.

Next, Defendants contend it is undisputed that Peters is a sophisticated investor and that this factor alone is enough for the Court to conclude Peters could not have justifiably relied on the statements made by the Frontieres. Defendants contend Peters is a sophisticated investor because he has developed profitable businesses in art, real estate, and banking. **Doc. 188 at 3.** It is undisputed that Peters is an art dealer and a real estate owner. **Doc. 200 at 6**. But Peters genuinely disputes the Tarsin Defendants' characterization of him as a sophisticated investor. Peters points to evidence that he has very little experience investing, has no self-managed portfolios, and does not own a stock portfolio. **Doc. 188-3 at 28:17–29:25.** Peters also points to evidence that when he did invest in other venture capital projects, he did so based on a long-term relationships with friends or people he trusted. *Id. See also* **doc. 200-2.** Finally, Peters cites expert testimony that investing in a business is different than running a business. **Doc. 200-1 at 64:220–22**. The Court concludes that the extent of Peters's experience and sophistication in financial and securities matters is genuinely disputed. And even if it were not, Peters's sophistication is only one of several factors that must be weighed when assessing Peters's justifiable reliance. Defendants also maintain that Peters did not justifiably rely on the Frontieres' statements because information about Tarsin's financials was publicly available on the Securities and Exchange Commission website. **Doc. 188 at 2.** Defendants provide no record support for this assertion; thus, they have not met their initial summary judgment burden.

Finally, Defendants urge the Court to hold as a matter of law that Peters did not justifiably rely on either the investor pitch deck provided to him by the Frontieres or the Frontieres' representation that Tarsin's stock share price would increase from $1.00 per share to $17.50 per

share after the initial public offering. Defendants argue that Peters's trepidation about wiring the money was feigned. On summary judgment, however, the Court cannot usurp the factfinder's role and assess a witness's credibility. *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000) ("It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment."). Defendants also direct the Court's attention to deposition testimony where Peters stated that he "wasn't looking at the 17 times return" and that the increase from $1.00 to $17.50 "wasn't [his] focus." **Doc. 188 at 19**. Although this statement can and will be weighed by the factfinder when assessing reliance, it is not in and of itself sufficient to grant summary judgment on this issue.

Having concluded that genuine issues of material fact preclude summary judgment on the issue of justifiable reliance, the Court turns next to Defendants' argument that Peters's securities fraud claims must fail because the alleged misrepresentations were either true or no more than opinions. Peters points to three sets of representations that the Frontieres made that Peters contends the Tarsin Defendants are on the hook for: (1) representations about Tarsin's value and the Lord Cultural acquisition; (2) representations about Tarsin's key management; and (3) representations about Tarsin's relationship and accomplishments. There are genuine issues of fact as to whether the statements identified by Peters are true, false, or opinions; therefore, summary judgment is inappropriate. The Court notes that even if the statements were opinions, opinions can still be actionable as securities fraud if there is no reasonable basis for the opinion given. *See Nakkhumpun v. Taylor*, 782 F.3d 1142, 1159 (10th Cir. 2015) ("An opinion is considered false if the speaker does not actually or reasonably hold that opinion."); *see also SEC v. GenAudio Inc.*, 32 F.4th 902, 925 (10th Cir. 2022) ("Statements of opinion are indeed actionable if the speaker omits material

facts that make the statements misleading to would-be reasonable investors."). Counts I and II survive summary judgment.

**Count III:      Common Law Fraud Claim**

Defendants also move for summary judgment on Peters's common law fraud claim. In New Mexico, the "elements of fraud include (1) a misrepresentation of fact, (2) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation." *Williams v. Stewart*, 2005-NMCA-061, ¶ 34, 112 P.3d 281, 290; *see also* NMRA Civ. UJI 13-1633. "[O]rdinarily claims of fraud present an issue of fact which cannot be determined on motion for summary judgment." *Lotspeich v. Golden Oil Co.*, 1998-NMCA-101, ¶ 10, 961 P.2d 790, 792 (citation omitted).

First, the Tarsin Defendants contend Peters "cannot identify a material misstatement[,] a misrepresentation, or even an omission of fact made by a Defendant prior to Plaintiff signing the Note." **Doc. 188 at 27.** Contrary to Defendants' assertions, Peters identifies many material misrepresentations and omissions made by the Frontieres on behalf of Tarsin before he signed the Note. These misrepresentations include the following:

- Lord Cultural made around $10 million a year. **Doc. 200-2 at 3–4**.

- Nicholas Frontiere's software would be combined with existing operations of Lord Cultural. **Docs. 200-2 at 3**, **206-10 at 66:8–11**.

- Nicholas's software would increase the value of the company from $1.00 per share to $17.50 per share after the initial public offering. **Docs. 206-16 at 41:4–25, 200-2 at 4, 206-10 at 81: 1–14, 190**.

- Peters was being offered a special, limited-time, friends-and-family opportunity to buy Tarsin stock at $1.00 per share. **Doc. 200-2 at 4, 5.**

- Peters would be guaranteed his money back with 5% interest within twelve (12) months. **Doc. 200-2 at 4**.

17

- In July of 2019, Tarsin was close to raising the $10 million needed to complete the deal between Tarsin and Lord Cultural. **Doc. 206-10 at 70:12–25; 72:7–23**.

- Peters needed to move quickly because Tarsin needed to complete the deal with Lord Cultural as soon as they could. **Doc. 206-10 at 72:7–23**.

- Nicholas Frontiere had conducted extensive due diligence before making his own investment in Tarsin. **Doc. 200-2 at 4**.

Peters also identifies several material omissions. For example, the Frontieres' failure to inform Peters that Tarsin had recently gone through bankruptcy proceedings, **doc. 200-13 at 109:5–10**, and that Lord Cultural made nowhere near $10 million a year, *id.* **at 173:3–174:5**.

Peters also asserts that the Frontieres made material misrepresentations and omissions *after* he signed the Note but before he wired the $750,000 to Tarsin. For example, on July 24, 2019— five days after Peters signed the Note and two days before Peters wired the money to Tarsin— Joseph Frontiere emailed Peters an investor pitch deck. This pitch deck listed Nicholas Frontiere as part of the management team and represented that Tarsin owned various real estate and hospitality projects. **Docs. 184-21, 184-22 at 24, 28**. Within an hour of emailing the investor pitch deck, Joseph also texted Peters this message: "I sent a deck with a summary of the Tarsin holdings. Tarsin owns them all and is having an IPO which you got in on early." **Doc. 184-23**. This too was not true. Tarsin had no formal agreement with any of the companies listed in the pitch deck. **Doc. 200-13 at 152:2–10, 173:3–174:5.** Moreover, the Frontieres' own retained expert Mr. Baca testified, "I could not relate the pitch deck to any financial information or any plan, or any other document." **Doc. 200-1 at 79:4–5.** In fact, in July of 2019, Tarsin had no revenue and no assets of any kind. **Docs. 200-12 at 23:18–25; 26:11–14, 200-13 at 290:17–19**. A reasonable jury could find these statements were material misrepresentations; thus, Peters has met his burden summary judgment burden. The Tarsin Defendants do not appear to contend that they cannot be held

vicariously liable for statements or omissions made by the Frontieres. Thus, the Court need not address this issue here.[7]

Second, the Tarsin Defendants contend they lacked the requisite scienter for common law fraud—i.e., that they did not know of the falsity of the representation or act recklessly. The Court concludes that genuine issues of material fact exist as to whether the Tarsin Defendants had the requisite scienter.

Third, Defendants rehash their previously raised arguments that Peters did not reasonably rely on the misrepresentations. For the same reasons the Court rejected Defendants' arguments against justifiable reliance in Counts I and II, the Court rejects the same arguments here.

Finally, Defendants argue the alleged misrepresentations are just statements of opinion. Genuine issues of material fact preclude summary judgment on this issue. Even if some of the statements are opinions, New Mexico allows fraud actions to proceed "where the defendant states *an opinion* or belief as to future occurrences which are shown to have had no support by the facts at the time *the opinions* or beliefs were given." *Reg. v. Roberson Const. Co.*, 1987-NMSC-072, ¶ 10 741 P.2d 1364, 1367 (emphasis added). It is genuinely disputed whether there was any factual support for the representations the Frontieres made to Peters. The Court denies the motion for summary judgment on Peters's common law fraud claim.

**Count IV:     Negligent Misrepresentation**

The Tarsin Defendants also take aim at Peters's claim for negligent misrepresentation. In New Mexico, "to recover under the claim of negligent misrepresentation plaintiffs must show

---

[7] The Court does, however, address whether the Tarsin Defendants can be held jointly and severally liable for any finding of federal or New Mexico securities fraud against the Frontieres in the Memorandum Opinion and Order resolving Peters's Motion for Partial Summary Judgment (**Doc. 184**).

(1) that defendants made a material misrepresentation of fact to plaintiffs, (2) that plaintiffs relied upon such representation, (3) that defendants knew the representation was false at the time it was made or made it recklessly, and (4) that defendants intended to induce plaintiffs to rely on such representation." *Saylor v. Valles*, 2003-NMCA-037, ¶ 17, 63 P.3d 1152, 1158. "A negligent misrepresentation is one where the speaker has no reasonable ground for believing that the statement made was true." *Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.*, 1991-NMSC-097, ¶ 13, 820 P.2d 1323, 1327.

The Tarsin Defendants challenge the negligent misrepresentation claim based on Peters's alleged lack of reasonable reliance. As with Peters's other fraud claims, genuine issues of material fact preclude summary judgment on the issue of Peters's reasonable reliance. Count IV survives.

### Count V:      Breach of Contract

Defendants next urge the Court to grant summary judgment on Peters's breach of contract claim because, according to Defendants, Peters was grossly negligent and otherwise reckless in knowingly ignoring the express terms of the Promissory Note, which granted the Tarsin Defendants the exclusive right to covert Peters's investment. **Doc. 188 at 31**.

Defendants read the Note as entitling Peters "to repayment of his $750,000 loan with 5% interest, but **ONLY** if [Tarsin] did not convert his load during the one-year term." **Doc. 188 at 35**. To support their interpretation, Defendants point to this provision of the Note:

> (a) Conversion: Lender agrees that all principal and interest represented by this Note, at the election of the Company, shall convert into fully paid and non-assessable shares of the common stock of TMIX, at any time before the Maturity Date of this note, without any action on the part of the Lender insomuch as it is the Lender's responsibility to accrue a zero sum balance in share purchase costs for COMPANY'S COMMON STOCK. **The company shall, at its election, force the conversion of the private placement contained herein to the COMMON STOCK of the company on or before July 15th 2020, at One Dollar ($1.00) per share, for a total of Seven Hundred and Fifty Thousand shares of COMMON STOCK. The Lender shall be entitled to conversion of the convertible**

> **preferred into the common stock of the company on a one to one basis,**
> **preferred share to common share**. The Company hereby provides Lender with
> piggyback registration rights. The Company shall register the converted shares on
> a best efforts basis.

**Doc. 9-1 at 1** (emphasis added). Based on this provision, Defendants argue Peters breached the

express terms of the Note by failing to execute and return a W-9 form as requested by Tarsin COO,

Mr. Ghiselli, in September 2019. The Court is not persuaded.

First, it is worth noting that Defendants have not brought a counterclaim for breach of

contract against Peters. And it is unclear to the Court how Peters alleged breach would forgive

Tarsin's alleged breach. But, more importantly, Peters genuinely disputes the facts Defendants rely

on for their argument. According to Peters, he received an email from Mr. Ghiselli claiming Tarsin

needed Peters to fill out a W-9 form for their "transfer agent" on September 22, 2019. **Doc. 200-2**

**at 17**. Peters thought the email might be a phishing attempt and forwarded it to his assistant. *Id.*

His assistant reached out to Tarsin to confirm that it was a legitimate request but received no

response from Tarsin. *Id.* Peters also adds that Defendants do not identify any language in the Note

requiring Peters to complete a W-9 form. **Doc. 200 at 41.** Peters's response evinces genuine issues

of material fact. These issues preclude summary judgment both for the Tarsin Defendants and for

Peters.[8]

### Count VI:      Breach of Covenant of Good Faith and Fair Dealing

Defendants also move for summary judgment on the grounds that Peters cannot claim

breach of the covenant of good faith and fair dealing because Peters's "acts are inconsistent with

the provisions of the written agreements"—i.e., Peters allegedly breached the Note by failing to

execute the W-9 form and thereby denied Defendants the right of conversion. **Doc. 188 at 37**. As

---

[8] In his Response, Peters argues that while Tarsin is not entitled to summary judgment on
the breach of contract claim, Peters is. **Doc. 200 at 53**. The Court is not persuaded.

discussed above, genuine issues of material fact preclude summary judgment on this issue. To the extent Defendants are requesting leave to amend their Answer to include a breach of contract claim, this request is denied.

### Count VII:    Civil Conspiracy Claim

Next, the Tarsin Defendants urge the Court to grant summary judgment in their favor on Peters's civil conspiracy claim because "the record is devoid of any statement or conduct surrounding activity establishing either direct or circumstantial evidence . . . where Plaintiff was defrauded by means of any two Defendant [*sic*] act to conceal, confuse, and obscure their fraudulent activity. **Doc. 188 at 38**. Because Defendants have pointed to a lack of evidence to support Peters's civil conspiracy claim, Peters has the burden of making a factual showing sufficient to establish the claim. But Peters need only cite facts from the record that establish "an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115.

Here, Peters has met his burden and cited sufficient facts on which a reasonable jury could infer that a civil conspiracy existed between the Tarsin Defendants and the Frontieres. In New Mexico, civil conspiracy requires a plaintiff to show "(1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts." *Seeds v. Lucero*, 2005-NMCA-067, ¶ 12, 113 P.3d 859, 862. A civil conspiracy consists of a "combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Id.* (citation omitted). "The purpose of a civil conspiracy claim is to impute liability to make members of the conspiracy jointly and severally liable for the torts of any of its members." *Id.* (citation omitted).

Peters points to evidence that the Frontieres ran the idea of soliciting an investment from Peters by the Tarsin Defendants and evidence that Joseph Cellura sent a text message on July 9, 2019, stating: "I thought about the Gerald Peters and Lord opportunity you mentioned yesterday sounds like a good fit." **Doc. 184-5.** Peters also has presented evidence that the Tarsin Defendants and the Frontieres knew that Tarsin had recently gone through bankruptcy proceedings, **doc. 184-1 at 4**, knew that Tarsin had no revenue and no assets of any kind at the time Peters made the investment, **docs. 200-12 at 23:18–25**, **200-13 at 290:17–19**, knew that Tarsin did not own or have active affiliation with any of the companies in the Tarsin pitch deck, **doc. 184-22,** knew that Tarsin was not a public reporting company, **doc. 189-3**, and knew that Lord Cultural made nowhere near $10 million a year, **docs. 189-8, 189-9**. The Tarsin Defendants had access to this information, and yet they did not share it with Peters and instead encouraged the Frontieres to continue to pursue Peters's $750,000 investment. *See* **doc. 184-5.** Not to mention, the Tarsin Defendants provided the vehicle—the Promissory Note—by which Peters would make the investment. **Docs. 184-8, 184-8A, 184-17, 184-18**. Moreover, each of the Defendants held roles as corporate executives of Tarsin, **doc. 184-22**; thus, each "stood to benefit" from Peters's investment, *Harvey v. THI of New Mexico at Albuquerque Care Ctr., LLC*, No. 12-CV-727 MCA/LAM, 2015 WL 12659914, at *25 (D.N.M. Mar. 31, 2015) (denying summary judgment based on circumstantial evidence that each defendant agreed with the alleged improper activity and stood to benefit from it). Based on this evidence, Peters has made a sufficient evidentiary showing. The civil conspiracy claim survives.

### Counts VIII, IX:       Accounting & Imposition of a Constructive Trust

Defendants also seek dismissal of Peters's requests for an accounting and the imposition of a constructive trust. Both an accounting and the imposition of a constructive trust are equitable *remedies*—not equitable claims. *Heimann v. Kinder-Morgan CO2 Co., L.P.*, 2006-NMCA-127,

¶ 20, 144 P.3d 111, 117 ("An accounting and an injunction are remedies only and do not constitute independent claims for the purpose of this analysis."); *In re Est. of Duran*, 2003-NMSC-008, ¶ 35, 66 P.3d 326, 338 ("The imposition of a constructive trust is an equitable remedy, and as such is within the broad discretion of the district court."). Accordingly, the Court need not pass on whether Peters is entitled to a particular remedy when liability has yet to be determined. The Court also need not pass on whether Defendants are entitled to raise the defense of unclean hands to the imposition of a constructive trust. Summary judgment as to the remedies described in Counts VIII and IX is denied.

### Real-Party-In-Interest Issue

Finally, the Tarsin Defendants urge the Court to grant summary judgment against Peters on all of his claims because they contend Peters is not the real party in interest. Defendants appear to make this argument because Peters withdrew the $750,000 he used to invest in Tarsin from a bank account titled Kathleen K Peters & Gerald Peters III Revocable Trust DTD 5/19/14. **Doc. 184-25**.

Defendants have waived any real-party-in-interest challenge by failing to raise it until now. Any argument that an action is not being prosecuted by the real party in interest "should be raised in timely fashion or it may be deemed waived." *Audio-Visual Mktg. Corp. v. Omni Corp.*, 545 F.2d 715, 719 (10th Cir. 1976). The Tarsin Defendants have had knowledge that the funds came from Peters's trust since July 31, 2019, but opted not to raise this issue until now. Accordingly, they have waived this argument. However, even if the Court were to reach the merits, Defendants' argument is still unavailing. First, the Promissory Note was signed by Peters in his own name—not in the name of the trust. **Doc. 9-1 at 3**. And second, Peters and his wife are the sole trustees, sole grantors, and, until their deaths, the sole beneficiaries of the trust. **Doc. 200 at 52**. Thus, there

appears to be no real-party-in-interest issue here. Finally, Defendants' contention that Peters "failed to name the trust to hide the source of the funds to avoid counter claims for his staff's negligence and other acts of recklessness" is baseless. **Doc. 188 at 43**. The Tarsin Defendants have not asserted any counterclaims in this litigation, and they fail to provide any evidence to support this personal attack on Peters.

### CONCLUSION

The Tarsin Defendants' Motion for Summary Judgment (**Doc. 188**) is **DENIED** for the reasons stated in this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

_____

CHIEF UNITED STATES DISTRICT JUDGE